**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**SANDRA FORTIER and PAUL OLSON**
**On behalf of O.O., a minor child,**

                    **Appellants/Plaintiffs**

**vs.**                                                    **No. 1:16-CV-00482**

**THE NEW MEXICO HUMAN SERVICES**
**DEPARTMENT and THE NEW MEXICO**
**DEPARTMENT OF HEALTH; BRENT**
**EARNEST, Secretary, New Mexico**
**Human Services Department, in his official capacity;**
**LYNN GALLAGHER, Acting Cabinet Secretary,**
**New Mexico Department of Health, in her official**
**capacity; CATHY STEVENSON, Director,**
**Developmental Disabilities Supports Division of**
**the New Mexico Department of Health, in her**
**official capacity; NANCY SMITH-LESLIE,**
**Director, Medical Assistance Division**
**Of the New Mexico Human Services Department, in her**
**official capacity,**

                    **Appellees/Defendants.**

**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

    **COME NOW** Plaintiffs, Sandra Fortier and Paul Olson, on behalf of their daughter O.O., a minor child, and through counsel of record, for their *Response in Opposition to Defendants' Motion to Dismiss*, and state as follows.

## I.    INTRODUCTION

    O.O. is an individual with a permanent disability that substantially limits her functioning in the community. O.O. qualifies for and receives Medicaid services. Plaintiffs, O.O.'s adopted parents, attempted to put O.O. on a waiting list for services to assist her to live in her community instead of isolated in an institution. Regardless whether O.O. is accepted to the Development

1

Disabilities Waiver ("DD Waiver"), the State will contribute to her continued care. The purpose of the DD Waiver is to reduce costs by providing community-based care. Section 8.290.400.9 NMAC. Defendants, based solely on O.O.'s diagnosis of fetal alcohol spectrum disorder ("FAS"), denied O.O. a place on the decade-long waiting list to be evaluated to determine whether her disabilities qualify her to receive community-based services. Defendants did not consider O.O.'s substantial and permanent limitations, which resemble intellectual disability ("ID"). Defendants based the rejection entirely on her FAS diagnosis. O.O. currently does not request particular services or dispute the need for a waiting list. O.O.'s sole requests are for Defendants (1) treat her the same as others with ID-related conditions, (2) evaluate her according to essential eligibility requirements, and (3) permit her to wait for services allocation.

Defendants' actions violate the Medicaid Act, 42 U.S.C. § 1396, *et. seq.* (2012); Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et. seq* (2012); the Rehabilitation Act, 29 U.S.C. § 794; the State and Federal constitutions; and the New Mexico Human Rights Act ("NMHRA"), NMSA 1978, § 28-1-1 (2000). Plaintiffs appeal Defendants' administrative rejection of O.O.'s application and the New Mexico Human Rights Bureau ("HRB") no-jurisdiction determination. Defendants encourage this Court to disregard key facts and essential statutory and constitutional guarantees in order to conclude that Plaintiffs' *Amended Complaint* should be dismissed. Defendants' *Motion to Dismiss* should be denied.

## II.   **BACKGROUND**

The Medicaid Act assists individuals who lack financial means to pay for health care, and the DD Waiver is a Medicaid program. 42 USC § 1396; Doc. 1-2 [Am. Compl.] ¶¶ 16-17. The Home and Community Based Waiver system ("HCBS") permits Medicaid-eligible individuals

with developmental disabilities who qualify for residential care in a Medicaid-funded Intermediate Care Facility for Individuals with ID ("ICF/IID") (formerly called "ICF/MR") to receive services in the community. 42 C.F.R. § 440.150 (2014); Doc. 1-2 ¶ 20. To qualify for the New Mexico DD Waiver, applicants must, in relevant part, have ID or a related condition. 8.290.400.10(B) NMAC; Doc. 1-2 ¶ 23.

## III.   ARGUMENT

Section 9.290.400.10(B) NMAC impermissibly narrows the federal definition of "related condition" in violation of the Medicaid Act, the ADA and the Rehabilitation Act, the State and Federal constitutions, and the HRA. Defendants' administrative decision to deny O.O. access to the DD Waiver waiting list was arbitrary, capricious, and not supported by substantial evidence. This Court should reject Defendants' contrary arguments

### A.   Standard for Review

The Court must in its determination of "whether the complaint states a cause of action for which relief can be granted," must accept all pleaded facts as true and grant all reasonable inferences in Plaintiffs' favor. *Am. Ass'n of Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1193 (D.N.M. 2010). To deny the *Motion*, the Court need not decide the merits but must "find only a reason to believe that the plaintiff has a reasonable likelihood of mustering factual support for the claims," and find the claims are "plausible." *Id.* (internal quotation marks and citations omitted). Motions to dismiss assess only "whether a complaint is sufficient on its face." *Id.* The Court may "weigh potential evidence that the parties might present at trial." *Id.* (internal quotation marks and citations omitted). "Granting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but

also to protect the interests of justice." *Lewis v. N.M. Dep't of Health*, 94 F. Supp. 2d 1217, 1232 (D.N.M. 2000) (internal quotation marks and citation omitted).

### B.      Defendants Improperly Limit Plaintiffs' Factual Allegations

Defendants refuse to consider O.O.'s adaptive functioning to determine whether she has a condition related to intellectual disability. Defendants simplify and mischaracterize O.O.'s disability as "a number of developmental delays and behaviors that are consistent with FAS," Doc. 5 at 7, but O.O.'s functioning is strongly related and comparable to intellectual disability. Plaintiffs alleged that O.O. has significant deficits in executive functioning, visual construction and social skills. She is naïve, gullible, and immature. She does not understand what words mean together or how math works in the world, and she struggles to use academic information in her life. She does not understand how to use money, correctly give change, or tell time. She cannot replicate what she learns in school due to memory deficits. She requires redirection, reinforcement, and repetition, as well as support and supervision to travel around school and go to the restroom. She sometimes engages in toddler-like behavior. Due to these difficulties, O.O. is at risk of sexual abuse, illegal activities, homelessness, and financial harm. Doc 1-1 ¶¶ 44-64.

O.O's deficits are permanent "impairments of general intellectual functioning or adaptive behavior similar to that of mentally retarded persons, and requir[ing] treatment or services similar to those required for these persons." 42 C.F.R. § 435.1010; Doc 1-1 ¶ 61, 78. Because O.O. has FAS, Defendants ask this Court to ignore O.O.'s actual functioning, which strongly relates to ID. The key point is not that "any individual with a condition who believes coverage should be extended to him or her could make the same argument [that the NM regulations are

arbitrary].'' Doc. 5 at 13. Instead, the Court must examine O.O.'s actual functioning in order to determine whether Defendants have violated the law.

Disputed facts undercut Defendants' *Motion*, and such disputes preclude granting the *Motion*. For example, discovery is required regarding: (1) Defendants'' process to amend 8.290.400(10)(B)(3) NMAC; (2) the information supporting 8.290.400(10(B)(3) NMAC; and (3) because the state submitted partially completed paperwork before the Fair Hearing, Defendants' evaluation of O.O.'s D.D. Waiver application. Finally, Defendants mention a ''joint powers agreement which establishes the respective responsibilities of the departments as related to home and community based waiver programs.'' Doc. 5 at 4, n.2. The agreement is important to assess New Mexico's HCBS program operations, and Defendants' reference to that document demonstrates that a *Motion to Dismiss* based on the pleadings is inappropriate. *See also* Doc. 5 at 6 n.4 (referring to disputed facts and implication regarding CMS, which application facts should be subject to discovery). Throughout this *Response*, Plaintiffs point to numerous pleaded facts that Defendants ignored in their effort to demonstrate insufficient alleged facts to support the pleaded claims.

## C.     The State Law Appeals After Removal Are Ripe and Proper

Defendants argue against both of Plaintiffs' appeals and claim (1) the HSD decision regarding Plaintiffs' DD Waiver eligibility is not final or ripe for this Court's consideration and (2) this Court lacks jurisdiction to consider the HRB jurisdictional determination. Doc. 5 at 9-11. As explained below, the HSD decision is final and the matter is ripe for consideration. Doc. 1-2 ¶ 3. In addition, Defendants provide no authority to support the position that a party cannot appeal an HRB jurisdictional determination. Nevertheless, consistent with Defendants' cited authority,

Doc. 5 at 10, Plaintiffs request that after this Court decides the federal claims (including whether the regulations at issue comply with federal law), the Court remand the state appeals for decision by the New Mexico state courts.

### 1. *HSD Appeal is Final and Ripe for Decision*

O.O.'s agency appeal of the eligibility determination is final and ripe for consideration. NMSA 1978, Section 39-3-1.1 (1999); Rule 1-074 NMRA. The agency appeal is ripe, because Rule 1-074 provides that "an aggrieved party may appeal a final decision or order of an [administrative] agency" to the district court and that court, acting in its appellate capacity, may "reverse an agency decision if it determines that the agency acted fraudulently, arbitrarily or capriciously, if the decision was not supported by substantial evidence, or if the agency did not act in accordance with the law." *N.M. State Bd. of Psychologist Exam'rs v. Land*, 2003-NMCA-034, ¶ 5, 133 N.M. 362; *See* § 39-3-1.1(D).

The DD Waiver eligibility decision is further a final order. On March 16, 2016, HSD upheld the Feb. 11, 2016 fair hearing decision to deny O.O. placement on the DD Waiver registry and stated, "If you do not agree with the decision, you may seek judicial review by filing a notice of appeal within thirty (30) days from the date of this decision with the First Judicial Court…An appeal may result in reversal of the decision." The hearing decision is the final order from HSD and DOH denying O.O.'s DD Waiver eligibility based on her FAS diagnosis.

Defendants assert that because O.O. filed this appeal "Plaintiffs do not consider the determination under state law to be final." Doc. 5 at 9. Plaintiffs appeal the hearing decision precisely because of its finality. To find otherwise forecloses appeal of all agency decisions. Plaintiff's claims for relief are ripe for this Court's determination based on Defendants' removal.

## 2. *Appeal from the HRB Determination is Appropriate*

O.O. appeals the HRB determination that it lacks jurisdiction to investigate her discrimination claims. This Court has jurisdiction over the appeal pursuant to Rule 1-076 NMRA, which states, "[a]n appeal from the Human Rights Commission may be taken by filing a notice of appeal in the form of a complaint in the district court." Any person aggrieved by an HRB order, including the complainant, may appeal to district court within 90 days of the order. *Id.* O.O. filed an HRB complaint on April 15, 2016 arguing that HSD and DOH denied her a public accommodation (admission to the DD Waiver waitlist) based on her particular disability—FAS. On May 5, 2016, the HRB Division Director notified O.O. that HRB lacked jurisdiction to consider the claim because the DD Waiver program "is not an establishment that offers its service to the public generally [and] . . . is a program based on specific eligibility criteria requiring approval for those individuals with physical or developmental disabilities." (the "HRB Order") Doc. 5-2 at 1-2. O.O. timely filed notice of appeal of the HRB Order in her *Amended Complaint* on May 24, 2016. Doc. 1-2 ¶ 4.

The HRB Order is an "order of the commission" for purposes of Rule 1-076, because it was a final determination that the DD Waiver program was not a public accommodation. HRB did not investigate or hold a hearing, and O.O. had no opportunity to present a case, but an appeal of the HRB Order is nevertheless available. *See Maso v. State of New Mexico Taxation & Revenue Dept., Motor Vehicle Div.*, 2004-NMCA-025, ¶ 16, 135 N.M. 152 ("To hold otherwise would effectively foreclose any due process challenges to the administrative process, which would impermissibly constrain the right of access to the courts"). O.O. exhausted her administrative remedies by complying with HRB's grievance procedures under NMSA 1978,

Section 28-1-10 (2005), she was aggrieved by the HRB Order, and her appeal, which was removed to this Court, is her last judicial resort. Should O.O. be denied appellate relief in this Court, she would be denied her constitutionally guaranteed right to access the courts. *See Jiron v. Mahlab*, 1983-NMSC-022, ¶ 7, 99 N.M. 425. Accordingly, this Court may hear the HRB Order appeal or remand to state court after deciding the federal claims.

**D.** **Defendants' Exclusion of FAS Violates the Medicaid Act**

Based on outdated and unsupported criteria, Defendants arbitrarily limited the 8.290.400.10(B)(3) NMAC "related conditions" definition, creating a substantially narrower criteria than described in the Medicaid Act. Defendants' *Motion* argues that many states exclude FAS, that federal law does not require inclusion of FAS, that Plaintiffs did not allege that O.O. meets the criteria, and that other courts have dismissed similar claims. Doc. 5 at 11-14. Defendants misstate the law and Plaintiffs' well-pleaded allegations. Defendants' *Motion* should be denied.

*1.* ***The New Mexico Criteria for "Related Conditions" is Substantially, Arbitrarily, and Impermissibly Narrower than the Federal Standard***

Under New Mexico law, an individual qualifies for the DD Waiver if she either has ID defined by IQ or a "specific related condition." 8.290.400.10(B) NMAC. In *Lewis*, the State explained that the DD Waiver Central Registry creates a gateway for access to services. The State argued that a person found to be DD Waiver "eligible" (as O.O. was not) and placed on the Central Registry (a "registrant") is not even *considered* for services until an opening or "unduplicated recipient" slot becomes available. Once a registrant is allocated to an available slot, the registrant becomes an "applicant" and the eligibility process begins. 94 F. Supp. 2d *at* 1334-35.

In 2012, HSD limited its list of qualifying "related conditions" to a portion of an eight-page list of "disorders in which mental retardation may occur," originally published in the 1992 edition of the Manual of the American Association on Intellectual and Developmental Disabilities ("AAIDD") (previously, American Association on Mental Retardation). Section 8.290.400.10(B)(3) NMAC Doc 1-1 ¶¶ 80, 89, 92-94 (the "1992 AAIDD List"). The 1992 AAIDD List was a causation table, not meant for state definitional use not considered exhaustive, and never intended to be used as a legal document. Doc. 1-2, ¶¶ 93-95. As late as 2010, AAIDD abandoned the 1992 AAID List because it was under-inclusive and could not keep up with changing science. Doc. 1-2 ¶¶ 97. In 2012, Defendants adopted only four and a half pages of the eight-page 1992 AAIID List, which AAID had already determined was under-inclusive. Doc. 1-2, ¶¶ 92, 95. Included in deleted pages was FAS, as well as other conditions caused by environmental factors. Doc. 1-2 ¶¶ 92, 96. Until the 2012, O.O. would have qualified for D.D. Waiver services.

Section 8.290.400.10(B)(3) NMAC now contravenes 42 CFR Section 435.1010, which defines a "related condition" as either cerebral palsy, epilepsy or "[a]ny other condition, other than mental illness, found to be closely related to [ID] because this condition results in impairment of general intellectual functioning or adaptive behavior similar to that of mentally retarded persons, and requires treatment or services similar to those required for these persons."[1] *Id*.; Doc. 1-2 ¶ 78. New Mexico's narrower "related condition" definition violates Medicaid requirements (1) for reasonable, ascertainable, and non-arbitrary standards and eligibility

---

[1] The 42 CFR 435.1010 mirrors the current AAIDD definition of related conditions. *See Intellectual Disability: Definition, Classification, and Systems of Supports* (11th Ed. 2010); *Royal v. Reese*, 24 F.Supp. 3d 1243, 1248 (N.D. Ga. 2014).

determination procedures; (2) to prevent the arbitrary denial or reduction of services to otherwise eligible beneficiaries because of diagnosis, (3) that mandate freedom of choice regarding services; and (4) that require participating HCBS state programs to inform participants who are likely to require ICF/IID services of feasible alternatives to facility based care. 42 U.SC. § 1396a(17); 42 CFR § 440.230(b); 42 CFR § 440.230(c); 42 USC § 1396n(c)(2)(C); Doc. 1-2 ¶¶ 75-78, 81, 82, 84, 101, 105, 117-124. Defendants misinformed Plaintiffs about O.O.'s eligibility and failed to provide Plaintiffs with accurate information about the federal eligibility requirements.

HCBS programs are inextricably linked to ICF/IID qualifications. HCBS waivers offer medical assistance "to beneficiaries who would otherwise need inpatient care that is furnished in a hospital, SNF, ICF, or ICF/IID." 42 C.F.R. § 430.25(c)(2). *See also* 42 § U.S.C. 1396n(c)(2)(B)(iii), 42 C.F.R. § 441.301, 42 C.F.R. § 440.150; 42 C.F.R. § 440.180; 42 C.F.R. § 441.301(c)(1)(vii). States may deviate from Medicaid law under HCBS waivers, but may not waive the requirement that waiver participants must qualify for an ICF/IID. 42 C.F.R. § 430.25(d) ("Requirements that are waived"). A wide-ranging set of ICF/IID services rely on the "ID" and "related conditions" definitions, including preadmission screenings, annual reviews, and resident safeguards. *See* 42 CFR § 483.100, *et seq*.

The New Mexico regulations follow this architecture. An individual requesting placement on the DOH central registry for ICF/IID and/or HCBS services must be pre-screened, 7.26.9.8(E) NMAC, and provided "freedom to choose between ICF/MR and home and community based services." 7.26.9.8(F) NMAC. The pre-screening process "determine[s] each person's choice between ICF/IID and [HCBS waiver services], and [determines] whether the

person has a developmental disability or related condition, as described in Section 7.8 [now Section 7.26.9.7(H) NMAC].” 7.26.9.8(E) NMAC. “[P]re-admission screening,” is defined as DOH's evaluation process to determine (1) “a person's choice between ICF/MR and community based services” and (2) “whether the person has a developmental disability as described in the [AAMR] Manual on Classification in Mental Retardation (1996), or a related condition as defined by 42 CFR § 435.1009 [now 42 § CFR 435.1010].” 7.26.9.7(G) NMAC. No 1996 AAMR Manual exists. Presumably 7.26.9.7 NMAC refers to the abandoned 1992 AAIDD List discussed above. Because 7.26.9.7(G) NMAC references the federal standard and the entire 1992 AAIDD List, O.O. qualifies for ICF/IID services, but not HCBS waiver services under 8.290.400.10(B)(3) NMAC.

How New Mexico qualifies recipients of ICF/IID services is a question for discovery. The definitions and terminology that the state employs for those services appear incongruent with those it uses to define eligibility for its DD Waiver programs. The definitional difference between New Mexico Medicaid programs is vital. An individual must have a meaningful choice between services offered through an ICF/IID and the DD Waiver. 42 USC § 1396n(c)(2)(C). If the state employs different qualification definitions for these programs, the O.O. cannot choose and is effectively forced into institutional care. The pre-screening process gave O.O. a choice during the pre-screening process, but after she selected the DD Waiver, the state moved the goalposts and denied her eligibility. O.O.'s place on the Central Registry thus greatly impacts O.O.'s freedom of choice under the Medicaid Act.

Defendants created a system that denies O.O. the opportunity to become a registrant, thereby denying her the opportunity to wait ten years to become eligible to be an applicant.

During these ten years, O.O.'s functioning, including her intellectual functioning, may regress due to the brain damage she sustained in utero and because environmental expectations increase with age. Doc. 1-2, ¶ 71. As a result, O.O.'s IQ may diminish and by the time she is evaluated for allocation, she may qualify for ID and services based on her IQ score.

## 2.  *Section 1396n Provides a Private Right of Action Under 42 U.S.C. § 1983*

Courts consider three factors to determine if a private right of action exists under Section 1983: (1) whether Congress intended for the provision to benefit the plaintiff; (2) whether the plaintiff demonstrated that the statutory right is not so "vague and amorphous" that enforcement strains judicial competence; and (3) whether the statute unambiguously imposes a binding obligation on the States such that "the provision giving rise to the asserted right . . . [is] couched in mandatory, rather than precatory terms." *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997). Defendants argue only the second requirement and cite 42 CFR § 430.25 to show that the government intended for states to define "related conditions." Doc. 5 at 12.

Medicaid enforcement questions are decided on a provision-by-provision basis and complaints must be pleaded in "manageable analytic bites." *Blessing*, 520 U.S. at 342. A state regulation may clarify the content of a federal statute that is itself privately enforceable, but private rights of action must be grounded first in a statute. *See Shakhnes v. Belin*, 689 F.3d 244, 254 (2d Cir. 2012). Defendants cite no authority to address the specific HCBS Waiver program at issue in this case—42 USC § 1396n *et seq*. Defendants cite only *Hobbs v. Zenderman*, which does not relate to HCBS programs. Only one federal appellate opinion addresses Section 1396n and carefully considers all three *Blessing* factors to find that Section 1396n affords a clear right to bring suit under Section 1983. *Ball v. Rodgers*, 492 F.3d 1094, 1103 (9th Cir. 2007).

3.  **New Mexico Must Assess O.O. Using a Standards-Based Definition of ID and Related Condition**

Defendants attempt to exclude individuals with environmentally caused ID by "defining" those causes out of the ID and "related conditions" definitions. An arbitrary exclusion results, without a meaningful standard. Despite Defendants' assertion that New Mexico regulations "do not apply on their face to an individual whose sole diagnosis is FAS," Defendants admit that, "some children with FAS may meet the criteria based on the severity of their mental impairment (IQ) alone." Doc. 5 at 3. Thus, while some individuals with FAS diagnoses have IQ scores low enough to qualify under 8.290.400.10(B)(1) NMAC, others do not. Two individuals with FAS and essentially identical behaviors that look just like ID could receive radically different or no services based only on IQ score. Defendants next contend, without citation, that in New Mexico "an individual must meet the diagnostic requirements before his or her functional limitations are considered." Doc. 5 at 3. The "related condition" category is designed to cover people, like O.O., who function like people with ID but do not meet the IQ requirement inherent in the ID definition. *See* 42 C.F.R. § 435.1010. The very notion of "relatedness" references ID specifically, and not any other condition. *Id*. Federal law ensures that states cannot limit a category by diagnosis alone precisely because diagnostic labels, especially labels that rely on IQ testing, do not always capture condition and functional limitations. *Id*.

Defendants argue that "similar challenges to eligibility qualifications for related conditions" have been rejected. Doc. 5 at 13. *Bryson v. Shumway*, however, concerned only the length and character of the state waiting list and does not address eligibility for a waiver or conditions related to ID. 308 F.3d 79, 86 (1st Cir. 2002). In *Snelling v. S.D. Dept. of Soc. Serv.*, 780 N.W.2d 472 (S.D. 2010), South Dakota's definitions aligned with the federal standards-

based definition, and the *Snelling* court looked to the federal "related condition" definition to analyze whether the plaintiff qualified for waiver services: "an applicant must meet *all* the requirements in 42 CFR § 435.1010" and functioning must "*be closely related to mental retardation." Id.* at 479 (emphases in original). The *Snelling* plaintiff did not qualify for services, because her condition did not closely resemble that of someone with ID. *Id.* at 479-480. The court stressed the importance of analyzing adaptive behavior and substantial functional limitations—which Defendants in the present case refused to do—to ascertain whether the applicant's condition resembled that of someone with ID. *Id.* at 476. By contrast, O.O meets these qualifications and would qualify for services under the *Snelling* standard.

The question in *Watson v. Goldberg* concerned whether federal statutes precluded Oregon from modifying eligibility standards for people already enrolled in its waiver program. 2008 WL 2944998 *5 (D. Ore. 2008). The court looked to federal statutes and regulations for guidance. Finding insufficient specificity regarding service standards for these waivers, the state agreed to develop "reasonable" eligibility standards. *Id.* at *3 (citing 42 U.S.C. § 1396a). *Watson* did not concern an ID waiver and involved existing participant eligibility standards—not admission standards. *Id.*

In *Bertrand v. Maram*, plaintiffs challenged Illinois' ability to set priority population criteria for services. 2006 WL 2735494 (N.D. Ill. 2006), *aff'd sub nom. Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452 (7th Cir. 2007). *Bertrand* involved Medicaid's "reasonable promptness" provision, which Plaintiffs do not challenge here, and the case did not concern a state's ability to set program eligibility requirements. Like *Watson*, however, *Bertrand* emphasized that states must "impose *reasonable and appropriate* limits or utilization control procedures based on the

need that individuals have for services covered under the waiver" because "[a]n individual's right to receive a service is dependent on a finding that the individual needs the service, based on appropriate assessment criteria that the State develops and *applies fairly* to all waiver enrollees." *Bertrand* at *6 (emphasis added).

In *Dunakin v. Quigley*, the Washington State definition of "related condition" differed from the federal definition. 99 F. Supp. 3d 1297, 1305 (W.D. Wash. 2015). The state created its own concept of "substantial functional limitations," which required applicants to have impairments in both intellectual abilities, as measured by IQ, *and* adaptive skills. *Id.* The state eventually conceded and re-evaluated 90 percent of applicants. *Id.* at 1337. The court granted summary judgment for the plaintiff and emphasized that the federal and state definitions must match: "It is not necessary that a person exhibit both impairment of 'general intellectual functioning' and 'adaptive behavior similar to that of mentally retarded persons." *Id.* at 1336.

### 4.       *States Have Limited Autonomy in Creating Waiver Programs Under 1396n*

States that choose to participate in the Medicaid program must comply with federal Medicaid law. *See Alexander v. Choate*, 469 U.S. 287, 290 n.1 (1985); *Bryson,* 308 F.3d at 89; *Bertrand* at *1. The Medicaid Act extends flexibility to states only in certain areas—including statewide-ness, comparability of services, and income and resource rules—and to certain groups. 42 USC § 1396n(c). HCBS Waivers permit states to design programs "limited to one or more of the following target groups or any subgroup thereof that the State may define: (i) Aged or disabled, or both; (ii) Individuals with Intellectual or Developmental Disabilities, or both; or (iii) Mentally Ill." 42 CFR § 441.301(b)(6). Between distinct HCBS Waiver programs, the state may create different programs and offer different services. States have no authority to offer different

services, without justification, to people with different diagnoses within one waiver program. CMS recently reiterated the kinds of flexibility and decision-making permitted for states. *See* CMS, "January 10, 2014 Fact Sheet: Summary of Key Provisions of the 1915(c) Home and Community-Based Services (HCBS) Waivers Final Rule (CMS 2249-F/2296-F)," at 1; *see also* 42 CFR § 441.301(b)(6), § 441.302(a)(4). States may impose "reasonable and appropriate limits or utilization control procedures *based on the need that individuals have for services covered under the waiver*." Timothy M. Westmoreland, Department of Health and Human Services Director, *Olmstead Letter #4*, January 10, 2001, at 5-6 (emphasis added). Nevertheless, a person's "right to receive a service is dependent on a finding that the individual needs the service, based on *appropriate* assessment criteria that the State develops and *applies fairly* to all waiver enrollees." *Id.* (emphasis added).

The "target groups" and "specific populations" to which Defendants refer are discrete groups based not just on diagnosis, but also on the actual functioning of the program enrollees. *See also* 42 U.S.C. § 1396n(h)(2)(B)(i)(7) (authorizing a state to "target the provision of home and community-based services under this subsection to specific populations"). A state can create a waiver that contains a group or subgroup and can differ services to that group or subgroup in comparison to other waiver groups or subgroups, but it must inform CMS and offer consistent services within that waiver. Federal programs are defined by who they include based on functional criteria and are designed so as not to exclude anyone based solely on diagnosis.

**5.      *Congress Intended to Utilize the Functional Approach***

Defendants provide no authority to justify rejecting the federal definition of "related condition." Defendants argue that "the fact that the applicable federal regulation, 42 C.F.R. §

430.25, purposefully does not specify these 'related conditions,' even though the regulation certainly could have, is consistent with the federal intent that this determination of qualifying conditions be left with the individual states." Doc. 5 at 12. Defendants disregard the federal definition of related conditions at 42 C.F.R. § 435.1010, which specifically and plainly lays out a definition based on a standard of functioning, not a list of diagnoses. It has been clear since 1978 that states are required to employ a functional, rather than diagnostic, approach to define ID:

> Congress abandoned the diagnostic approach which limited the definition to the specific, categorical diagnoses of mental retardation, cerebral palsy, autism, epilepsy or other conditions closely related to mental retardation, and adopted the current functional approach, thereby expanding the definition to include all persons with disabilities attributable to mental or physical impairments who also meet the functional criteria.

*Pacheco v. Rhode Island Dep't of Mental Health, Retardation & Hosps.*, 1996 WL 936911, at *5 (R.I. Super. Mar. 22, 1996) (citations omitted).

Defendants argue that New Mexico uses a specific list of eligible recipients in an effort to save costs, Doc. 5 at 16, 17, but offer no evidence to support the assertion. Given that New Mexico already has a long waiting list for recipients and that O.O. requests to be added to the waiting list and not to immediate DD Waiver allocation, Defendants' argument demonstrates a need for discovery related to cost savings. The DD Waiver offers an alternative to ICF/IIDs, and is designed to save money. *See* 42 USC § 1396a(10)(A)(ii)(VI), § 1396n(c); 8.290.400.9 NMAC. It may cost New Mexico *more* money to deny O.O. DD Waiver services and force her to live in an ICF/IID. *See* 42 CFR § 441.303(f)(1) (costs of waivers cannot exceed costs of services absent Waiver). In enacting the freedom of choice provisions, Congress's main concern was the health and welfare of individual Medicaid recipients, "not any potential cost-savings that might result from a shift away from institutionalization." *Ball*, 492 F.3d at 1114.

### 6.     _Defendants Must Be Specific and Accurate in Their CMS Application_

As Defendants assert, New Mexico's DD Waiver program "must be approved by the Secretary of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS)." Doc. 5 at 4 n.3. In its CMS application, New Mexico did not submit the full eligibility framework that the State has used since 2012 to assess registrant eligibility. 8.290.400.10 NMAC. Defendants mischaracterize Plaintiffs' argument: "Plaintiffs also [argue] that because the New Mexico DD Waiver application form itself does not include every detail about who is eligible and who is not, the state must grant O.O. eligibility" and assert in a footnote that "Defendants can show that the regulations in question were submitted and reviewed by the required federal agency" Doc. 5 at 13, 6 n.4. Defendants again improperly attempt to insert references to possible evidence in a motion based on the sufficiency of the pleadings. Further, the extent to which CMS is aware of New Mexico's limited eligibility is an important question for discovery. Plaintiffs have properly alleged that Defendants have not notified CMS of the narrow criteria. Doc. 1-2 ¶ 116. While not dispositive, the CMS application is relevant to show how New Mexico's DD Waiver program actually functions and how Defendants make eligibility decisions. It is significant that Defendants omitted the 8.290.400.10(B)(3) NMAC list—amended in 2012 using data from 1992—from their federal application.

In a similar sense, the waiver programs of other states are also relevant—though not dispositive. Defendant inaccurately characterized how other states handle FAS, saying, "a review of regulations from all 50 states confirms that many states, not just New Mexico, do not include fetal alcohol syndrome among those conditions eligible for the DD Waiver program." Doc. 5 at 11-12. Defendants' "survey" appears to chart only whether states mention FAS by name or have

specific waivers targeted directly to FAS, not whether a person of O.O.'s functional abilities would qualify in those states. Defendants continue to insist on imprisoning O.O. in her diagnosis.

E.     **Defendants' Refusal to Qualify O.O. On The Basis of Her FAS Diagnosis Violates the ADA and Section 504**

This case implicates the proper interpretation and application of the integration mandate the ADA. *See Olmstead v. L.C.*, 527 U.S. 581 (1999); *see also* Doc. 1-2 at ¶¶ 128-146. Finding that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[,]" Congress sought "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" through the enactment of the ADA. 42 U.S.C. § 12101(a)(2), 42 U.S.C. § 12101(b)(1).

In *Tennessee v. Lane,* the Supreme Court of the United States noted:

> It is not difficult to perceive the harm that Title II is designed to address. Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights…The historical experience that Title II reflects is also documented in this Court's cases, which have identified unconstitutional treatment of disabled persons by state agencies in a variety of settings, including unjustified commitment, the abuse and neglect of persons committed to state mental health hospitals, and irrational discrimination in zoning decisions. The decisions of other courts, too, document a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system, public education, and voting.

541 U.S. 509, 524-25 (2004) (footnotes and internal citations omitted). In *Olmstead*, the United States Supreme Court called attention to Congressional commitment to "secure opportunities for people with developmental disabilities to enjoy the benefits of community living," noting that Congress used mandatory language in the Rehabilitation Act of 1973 to "proscribe

discrimination against persons with disabilities." *Olmstead,* 527 U.S. at 599. In the ADA, "congress explicitly identified unjustified 'segregation' of persons with disabilities as a "for[m] of discrimination." *Olmstead*, 527 U.S. at 600.

Section 504 of the Rehabilitation Act and Title II of the ADA both prohibit discrimination against individuals with disabilities.

> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a) (Rehabilitation Act).

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (ADA). Due to shared purposes and elements, the Tenth Circuit "construe[s] the ADA as giving at least the same amount of protection as the Rehabilitation Act." *Swenson v. Lincoln Cty. Sch. Dist. No. 2*, 260 F. Supp. 2d. 1136, 1145 (D. Wyo. 2003)*; see also Cohon ex rel. Bass v. State Dep't of Health*, 646 F.3d 717, 725 (10th Cir. 2011).

Defendants mischaracterize Plaintiffs' discrimination claims. The Medicaid program is a medical assistance program cooperatively funded by the federal and state governments. *See* Doc. 1-2, at ¶¶ 12, 13, 16 and Doc. 5 at 2]. A state electing to participate is required to administer the program in accordance with all federal laws, including the ADA and the Rehabilitation Act. Defendants elected to administer the DD Waiver to serve persons with ID and developmental disabilities and must administer those services in accordance with the ADA. *See* Doc. 1-2, at ¶¶ 20, 23. The prohibition against disability discrimination applies to all services, programs, or activities provided by a public entity—even optional programs. *See Steimel v. Wernert*, 2016 WL

2731505, *8 (7th Cir. May 10, 2016) (observing that a state may "violate Title II when it refuses to provide an existing benefit to a disabled person that would enable that individual to live in a more community-integrated setting"); *Radaszewski*, 383 F.3d at 609 (noting that "States must adhere to the ADA's nondiscrimination requirement with regard to the services that they in fact provide" (quoting *Olmstead*, 527 U.S. at 603, n. 14)); *see also Lovell v. Chandler*, 303 F.3d 1039, 1056 (9th Cir. 2002) (prohibiting the state from categorically excluding persons with disabilities from a pilot Medicaid waiver program).[2]

The Department of Justice ("DOJ") has issued guidance regarding the ADA's integration mandate, clarifying that "a state's obligations under the ADA are independent from the requirements of the Medicaid program." *Statement of the Department of Justice on the enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.*, at 5 (June 22, 2011) [hereinafter "DOJ Statement"]. The DOJ explains that the ADA may require states to provide Medicaid services beyond what is currently provided when a provision does not fundamentally alter the program. For example, a state is not exempt from serving people to comply with the ADA or other laws, even if the state is permitted to "cap" the number of individuals it serves in a particular Medicaid waiver program. *Id.* New Mexico has elected to provide Medicaid to people with ID and/or developmental disabilities. O.O. seeks these Medicaid services, which are available to other individuals with ID and/or developmental disabilities. O.O. was denied these services on the basis of FAS. Unlike people with ID or other

---

[2] The Tenth Circuit distinguished the categorical exclusion in *Lovell* from the allegations in *Cohon*, which addressed general budget limitations under the Mi Via Waiver. Like *Lovell*, the case at bar involves categorical exclusion from a Medicaid program. *Cohon*, 646 F.3d at 728.

developmental disabilities, in New Mexico people with FAS are eligible for the DD Waiver only if they are also people with a significantly sub average IQ. *See* Doc. 1-2, at ¶¶ 74-98.

Title II provides that "qualified individual[s] with a disability" may not "be subjected to discrimination." 42 U.S.C. § 12132. "Qualified individuals," are people with disabilities who, "with or without reasonable modifications to rules, policies, or practices…meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2). In *Cohon*, the Tenth Circuit set forth the elements that must be met to state claims under Title II and under 504:

> To state a claim under Title II, the plaintiff must allege that "(1) she is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas Cty. Sherriff's Dept.*, 500 F.3d 1185 (10th Cir. 2007).

646 F.2d at 725. To state a claim under Section 504, "a plaintiff must prove (1) that he is a 'handicapped individual' under the Act, (2) that he is 'otherwise qualified' for the [benefit] sought, (3) that he was [discriminated against] solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance." *Johnson by Johnson v. Thompson,* 971 F.2d 1487, 1492 (10th Cir.1992) (citations omitted). *Id.* There are three theories of discrimination available to a plaintiff alleging a violation of Section 504 and Title II of the ADA: (1) intentional discrimination; (2) discriminatory impact; and (3) a refusal to make a reasonable modification. *Swenson* 260 F. Supp. 2d at 1144. The facts alleged in Plaintiffs' *Complaint* satisfy all the requirements necessary to defeat Defendants' *Motion to Dismiss* under all theories of discrimination.

Under *Olmstead*, plaintiffs may bring a case even if they cannot prove that "but for" her disability, O.O. would receive the community-based services she seeks. 527 U.S. at 598; *see also* 28 C.F.R. 35.130(d); *see also* "DOJ Statement." Plaintiffs have a distinct claim to community-based services that does not rely on a showing of disparate treatment or disparate impact. *Id.* Moreover, contrary to Defendants' argument, Plaintiffs have alleged facts and law showing intentional discrimination, which is not required to prove a Section 504 violation. *See* Doc. 5 at 15. A showing of intentional discrimination is not required when Plaintiffs are not seeking compensatory damages. *See Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372, 1385 (10th Cir. 1981) (setting forth standards for deciding claims under Section 504); *see also Alexander,* 469 U.S. at 297, n.17 (explaining that courts properly consider disability discrimination claims that include disparate impact claims, such as procedures and the denial of special education assistance for handicapped children). Intentional discrimination, however, can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will result in a violation of federally protected rights. *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999). Plaintiffs alleged deliberate indifference. *See* Doc. 1-2, at ¶ 144.

### A. O.O. is a Qualified Individual with Disabilities Who Meets the Essential Eligibility Criteria of the State's DD Waiver Medicaid Program

O.O. is a qualified individual with disabilities, because she meets the federal criteria for a person with a developmental disability: she has a "related condition" akin to ID, as defined by federal law. 42 C.F.R. § 435.1010. *See* Doc. 1-2 at ¶¶ 35-65, 76, 77, 78, 88. The factual issues presumed true for this *Motion* include: 1) O. O. is a person with a developmental disability; 2) O.O.'s functioning is tantamount to a person with ID; 3) O.O. has FAS, which is associated with anomalies in the brain; 4) O.O.'s FAS diagnosis qualifies her as a person with a syndrome; 5)

O.O. has a developmental disorder of brain formation; 6) O.O. has brain damage; 6) O.O.'s disabilities have affected her I.Q.; and 7) I.Q. is a relatively insensitive measure of adaptive capability and functioning. [Doc. 1-2, at ¶¶ 42-59, 67-68, 71-72 110]. There are other cognition measures apart from an IQ test, which does not adequately assess a person's intellectual functioning. Doc. 1-2, ¶ 72.

Unlike the plaintiff in *Royal*, 24 F. Supp. 3d 1243 (N.D. Ga. 2014), cited by Defendants, O.O. alleges that her disabilities significantly impairs both her general intellectual functioning and her adaptive behavior. Although she is thirteen years old, O.O. has significant learning deficits, difficulty understanding what words mean together, how math works, how money works, how to tell time, and how to complete or replicate what she learns without assistance. Doc. 1-2, at ¶¶ 47-48. O.O. requires a 1:1 aide in school because she requires redirection, reinforcement, and repetition. Doc. 1-2 at ¶¶ 41, 42, 47, 50. She sometimes engages in toddler-like behavior. Doc. 1-2, at ¶¶ 47. O.O. is already institutionalized and needs intensive supports to live in the community. Doc. 1-2, at ¶¶ 39, 50, 55, 63, 64. O.O.'s condition is life-long. Doc. 1-2, at ¶ 61. The Court must assume that O.O. has severe intellectual functioning deficits that meet the essential functional limitation deficits required by federal law for the DD Waiver. *See* Doc. 1-2, at ¶¶ 74-110.

### B. O.O. Was Excluded From Participation In Or Denied The Benefits Of The DD Waiver

Although Defendants have not yet answered the complaint, their *Motion* concedes that O.O.'s DD Waiver application was denied. *See* Doc. 5 at 3-4. See also, Doc. 1-2, at ¶ 30.

### C. Because of Her Disability, O.O. Was Excluded From The DD Waiver, Denied DD Waiver Benefits, and Discriminated Against In The Administration Of The DD Waiver.

O.O. was improperly denied benefits because Defendants have categorically excluded FAS as a permissible "related condition" in their regulatory structure. The terms "intellectual disability" and "related condition" are defined in federal regulations. *See* Doc. 1-2, at ¶¶ 74-98. In addition, the degree of impairment required to qualify for placement in an ICF/IID is set forth in federal regulation. *See* Doc. 1-2, at ¶ 75. O.O. seeks public benefits available to other persons with developmental disabilities. Defendants denied her these benefits solely because the state impermissibly excluded consideration of FAS as a "related condition." There is no scientific or logical reason for New Mexico's denial of DD Waiver coverage for individuals with related conditions resulting from perinatal and postnatal causes, such as FAS. Doc. 1-2, at ¶ 85. New Mexico relies on the 1992 AAIDD List to narrow "related conditions," but the AAIDD List was not intended to be definitional, and importantly, the 1992 AAIDD List captured perinatal and postnatal causes of ID, including FAS. Doc. 1-2, at ¶ 92, 93, 95, 96. Defendants did not adopt the entire 1992 AAIDD List and instead removed significant portions of the document to develop their own "specific related conditions" list. Doc. 1-2, at ¶ 92. Because FAS is an excluded diagnosis, Defendants refused to consider whether O.O.'s functional limitations are akin to ID when reviewing her DD Waiver application. *See* Doc. 1-2, at ¶¶ 99-108.

### D. New Mexico Receives Federal Financial Assistance For Its DD Waiver Program

Plaintiffs allege that Medicaid is a program that includes state and federal moneys. *See* Doc. 1-2, at ¶¶ 12, 13, 16; *see also*, Doc. 5 at 2. Defendants deliberately and intentionally promulgated and implemented a regulation that categorically excludes O.O. from the DD Waiver based on her disability as a person whose condition related to ID resulted from FAS. *See* Doc. 1-

2, at ¶¶ 87-98-109. Regulations promulgated and implemented by Defendants have a disparate impact on O.O. as a person with FAS.

**E.  *O.O. Is At Risk For Unnecessary Institutionalization By State Policies Or Practices***

The DD Waiver is designed to enable people with developmental disabilities to obtain Medicaid services in the community. In *Olmstead*, the Supreme Court held that public entities are required to provide community-based services to people with disabilities when (a) the state's treating professionals have determined that the services are appropriate and that an individual meets the essential eligibility requirements for the services; (b) the affected persons do not oppose community-based treatment; and, (c) community–based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of others who are receiving disability services from the entity. *Olmstead*, 527 U.S. at 602-03, 607. O.O. alleged both that she meets the essential eligibility requirements for services and that the state has refused to determine whether services are appropriate. *See* Doc. 1-2, at ¶¶ 104-109.

To carry out the mandates of the ADA, the Attorney General promulgated an "integration regulation," providing that "[a] public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 CFR § 35.130(d). Public entities must also make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)*; see also* 34 CFR § 104.4(b)(4); 28 CFR § 35.130(b)(3) (explaining that states may not utilize criteria or methods of administration that effectively subject qualified individuals with disabilities to

discrimination on the basis of disability). A public entity may not "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 CFR § 35.130(b)(8). Defendants cannot show that providing O.O. with community based DD Waiver services would fundamentally alter their Medicaid program.

Plaintiffs affirmatively seek community-based services for O.O., as shown by their application and appeal of the denial of DD Waiver services. New Mexico regulations did not graft the partial 1992 AAIDD List of eligible diagnoses into the regulatory definition of "related conditions" and was not so restrictive as to categorically exclude persons with FAS from qualification for DD Waiver services. This demonstrates that community-based services can be reasonably accommodated for persons such as O.O. with FAS. *See* Doc. 1-2, at ¶ 87.

O.O. is already subject to institutional placement, but an individual need not be institutionalized to assert an *Olmstead* claim. *See Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181-82 (10th Cir. 2003) (noting "nothing in the *Olmstead* decision support[ed] a conclusion that institutionalization is a prerequisite to enforcement of the ADA's integration requirements"). O.O. and others similarly situated are at serious risk of unnecessary institutionalization resulting from Defendants' policies and practices excluding from the DD Waiver people with FAS, an IQ above 70, and intellectual and functional limitations akin to ID.

The State must provide O.O. with meaningful access to DD Waiver services. *See Robertson,* 500 F. 3d at 1195 ("The ADA requires more than physical access to public entities: it requires public entities to provide '*meaningful* access' to their programs and services") (emphasis

in original). "A state that chooses to provide optional services cannot defend against the discriminatory administration of those services simply because the state was not initially required to provide them." *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1302 (M.D. Fla.2010). A state must comply with the ADA while providing those services, "just as it would have to comply with the ADA for any other 'services, programs, or activities' provided by a public entity." *Id.* Compliance with the ADA and implementing regulations requires that Defendants be estopped from utilizing 8.290.400.10(3) NMAC and O.O. be determined eligible for Medicaid-wavier services. Plaintiffs have stated a claim under the ADA, and Defendants *Motion* should be denied.

### F. Defendants Violated State Rulemaking Procedures When Section 8.290.400.10(B) NMAC Was Amended to Exclude FAS and Other Conditions

Both DOH and HSD are charged by New Mexico statute with creating rules and regulations to carry out their mandates. See NMSA 1978 § 27-1-3, § 9-7-6(E). Likewise, both agencies are subject to the State Rules Act, § 14-4-1 *et seq*. The authority cited by HSD to promulgate the regulation at issue in this case, Section 8.290.400.10(B) NMAC, does not reference the Administrative Procedures Act ("APA"). However, DOH and HSD have consistently held themselves out as agencies to which the APA applies. The agencies publish rules and solicit comments and appear to comply with the APA. Both entities have sections on their websites dedicated to public notices, proposed changes, and opportunities to comment.

The APA does not represent Plaintiffs' only complaint regarding rule making. Plaintiffs also alleged "Defendants exceeded their authority by establishing and implementing regulations that impermissibly restrict persons with fetal alcohol syndrome and other related conditions from accessing and participating in the DD Waiver program and services when other similarly situated persons are able to access and participate in the DD Waiver program and services." Doc. 1-2 at ¶

151. As shown within this response, Defendants rule-making was arbitrary and capricious, and not adequately supported, and these regulatory changes are in violation of New Mexico law. *See Rio Grande Chapter of Sierra Club v. New Mexico Mining Comm'n*, 2003-NMSC-005, 133 N.M. 97 ("Normally an agency rule would be arbitrary or capricious if the agency . . . failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *Wilcox v. New Mexico Bd. of Acupuncture & Oriental Med.*, 2012-NMCA-106, ¶ 7, 288 P.3d 902; *NM Mun. League v. NM Envtl. Improvement Bd.*, 1975-NMCA-083 88 N.M. 201; *City of Roswell v. NM Water Quality Control Comm'n*, 1972-NMCA-160, 84 N. M. 561.

### G. The Exclusion Of FAS From State Medicaid Services Violates Equal Protection Principles

Plaintiffs raise claims pursuant to the equal protection clauses of the United States Constitution and the New Mexico Constitution. Section One of the Fourteenth Amendment to the United States Constitution states in pertinent part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1. "Unless a legislative classification or distinction burdens a fundamental right or targets a suspect class, courts will uphold it if it is rationally related to a legitimate end." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998). People with disabilities are not considered a suspect class under the federal equal protection clause, and

as a result, challenged state actions survive if they "rationally further[] a legitimate state interest." *Cohon,* 646 F.3d at 730. A rational basis is "a plausible policy reason for the classification." *Id.* (internal quotation marks and citation omitted.)

"The Equal Protection Clause of the New Mexico Constitution affords rights and protections independent of the United States Constitution." *Breen v. Carlsbad Mun. Sch.*, 2005-NMSC-028, ¶ 14, 138 N.M. 331. The Equal Protection Clause of the New Mexico Constitution states: "No person shall be deprived of life, liberty or property without due process of law; nor shall any person be denied equal protection of the laws. Equality of rights under law shall not be denied on account of the sex of any person." N.M. Const. Art. II, § 18. In order to establish a New Mexico Equal Protection claim, the plaintiff must show she is "similarly situated to another group but [is] treated dissimilarly." *Breen*, 2005-NMSC-028, ¶ 8. Because the New Mexico Supreme Court determined that "it is appropriate to apply intermediate scrutiny to classifications based on mental disability," the opposing party must then establish that the legislation withstands intermediate scrutiny, *Id.* ¶¶ 28, 30. Under intermediate scrutiny, the Court considers the governmental interests served by the legislative classification and whether the classification bears a substantial relationship to "any such important interests." *Id.* ¶ 30.

### 1. Defendants Violated The Federal Equal Protection Clause By Denying O.O. Access To Apply For D.D. Waiver Services

O.O. is similarly situated to others with developmental disabilities. *See* 8.290.400.10(B)(2) NMAC. Plaintiffs have alleged that (1) she has a condition that results in impairment of general intellectual functioning or adaptive behavior similar to that of persons with ID and requires treatment or services similar to individuals with ID, (2) her condition manifested before she reached 22 years, (3) her condition will likely continue indefinitely, and

(4) her condition results in substantial functional limitations in three or more identified areas of major life activity. Doc. 1-2 ¶ 110. Plaintiff further alleged facts about O.O.'s condition and limitations to support this allegation. Doc. 1-2 ¶¶ 34-57. Despite her similar situation to others who are eligible for DD Waiver services, O.O. was denied services solely because she has an FAS diagnosis—because she has a particular disability.

Defendants articulated no rational basis for this exclusion from the waiting list. Defendants state that it is not reasonable "to find that the state cannot set criteria to determine who will be entitled to receive such benefits." Doc. 5 at 17. Plaintiffs do not challenge the essential eligibility criteria contained in 8.290.400.10(B)(2)(b), (c), (d), and (e) NMAC. Plaintiffs challenge the further exclusion of people with FAS diagnoses who can meet the essential eligibility criteria and who are otherwise Medicaid eligible. Defendants do not explain the plausible and non-discriminatory policy reason for excluding diagnoses from the "related condition" definition, despite (a) the caution of the medical community against attempting to create exhaustive lists, (b) AAIDD's inclusion of FAS as a condition related to ID, and (c) the evidence that O.O. meets the essential eligibility requirements for services. Defendants do not explain how putting someone on the waiting list costs money or how a shorter waiting list, by way of arbitrary exclusion of otherwise eligible applicants, furthers a legitimate state interest or a plausible policy reason. Plaintiffs do not request that O.O. immediately receive services. O.O. should be evaluated based on her functional limitations and likelihood for continued need, not on her recent FAS diagnosis. *See* § 8.290.40010(B)(2)(b), (c), (d), and (e). Defendants' arbitrary exclusion of persons with particular diagnoses, who meet the DD Waiver essential eligibility requirements, is without rational basis and violates the Federal Equal Protection clause.

## 2. Defendants Violated the New Mexico Constitution By Denying O.O. Access to D.D. Waiver Services

O.O. is a person with condition related to ID who meets the financial and medical criteria for institutional or intermediate care facility, but she is treated dissimilarly to others who also meet these criteria, because she is diagnosed with FAS. O.O. is a similarly situated to another group but is treated dissimilarly. *Breen*, 2005-NMSC-028, ¶ 8. Defendants must demonstrate that the FAS exclusion bears a substantial relationship to an important governmental interest. *Id.* ¶¶ 28, 30.

The purpose of the D.D. Waiver is to provide home and community-based services to Medicaid applicants/recipients with ID or a related condition who meet the financial and medical criteria for an ICF/IID level of care. 8.290.400.9 NMAC. Community-based services allow these individuals "to receive the care required at home at less cost than in an institution." *Id.* The only purported governmental interest is the ability to "set criteria" to determine who will be entitled to benefits, because there are limited resources and a long waiting list. Doc. 5 at 17. Defendants have defined "related condition" in a manner that excludes O.O. based on her diagnosis. O.O. meets the essential eligibility requirements for DD Waiver services, and she seeks to be added to the waiting list to receive services when space and resources come available. Excluding O.O. from the waiting list serves no purpose other than to reduce the length of the waiting list, and Defendants do not explain why reducing the waiting list by excluding individuals who meet the essential eligibility criteria is a legitimate state interest. The DD Waiver otherwise states no purpose to justify excluding persons afflicted with ID because of environmental exposures.

Defendants argue that *Breen* does not require intermediate scrutiny, because this case does not involve greater benefits for physical disabilities than mental disabilities. Doc. 5 at 16-17.

*Breen*, however, does not associate levels of scrutiny with types of claims—pitting mental disability claims against physical disability claims, for example—but rather with the class of people. In considering whether to apply intermediate scrutiny, the *Breen* Court considered the historical persecution of the group and noted "'even within the disability community, persons with mental illness are often the poor stepchild, and remain the last hidden minority.'" 2005-NMSC-028, ¶¶ 22, 24 (quoting Michael L. Perlin, *The ADA and Persons with Mental Disabilities: Can Sanist Attitudes Be Undone?* 8 J.L. & Health 15, 20 (1993-94)). Effective political advocacy on behalf of people with mental disabilities, the Court observed, "is seriously hindered by the need to overcome the already deep-rooted prejudice against their integration in society." *Breen*, 2005-NMSC-028, ¶ 29. Nothing suggests that this Court should apply lesser scrutiny when a classification further divides an already sensitive class. Defendants, attempting to distinguish *Breen*, confuse the "similarly situated" analysis with the level of scrutiny analysis. To determine whether O.O. is similarly situated to others, she must be compared to others who have been permitted to join the waiting list. Regardless of her comparison to others similarly situated, O.O. is undoubtedly a part of a sensitive class, people with "mental disability[ies]", and Defendants have discriminated against O.O. based on a "mental disability," as the *Breen* Court defined the class, or more specifically in this case, an intellectual disability. *Id.* ¶ 28. Defendants must identify a governmental interest served by the classification, which must "bear a substantial relationship to any such important interests." *Id.* Defendants suggest that the FAS exclusion will save resources and reduce the waiting list, but Defendants chose to serve individuals like O.O. who meet essential eligibility criteria and reducing the waiting list through arbitrary exclusions serves no legitimate governmental purpose.

**H.  Making a Distinction in Offering or Refusing to offer DD Waiver Services to O.O. Violates the New Mexico Human Rights Act**

The NMHRA prohibits "any person in any public accommodation to make a distinction, directly or indirectly, in offering or refusing to offer its services, facilities, accommodations or goods to any person because of . . . physical or mental handicap." NMSA 1978, § 28-1-7(F). O.O. is a citizen of New Mexico and a person with a mental handicap—FAS. Doc. 1-2 ¶¶ 9, 164. The DD Waiver program constitutes a public accommodation under the NMHRA because through this Medicaid program, Defendants offer public services. 9.1.1.7(Z) NMAC. The DD Waiver program is also the mechanism through which eligible individuals access public services, including medical services, facilitates, accommodations, or goods.  Doc 1-1 ¶ 165.

O.O. was denied the public accommodation of the DD Waiver based on her mental handicap in violation of the NMHRA. Section 27-1-7(F). Plaintiffs have alleged facts and law sufficient to state claims that O.O. was discriminated against on the basis of her disability. Because the NMHRA is analogous to the Civil Rights Act, New Mexico courts have analyzed discrimination under the act consistently with other civil rights act prohibiting race, age and disability discrimination. *See e.g., Martinez v. Yellow Freight System*, 1992-NMSC-015, ¶ 8, n.3, 113 N.M. 366; *Smith v. FDC Corp.*, 1990-NMSC-020, ¶ 9, 109 N.M. 514. Because Plaintiffs have alleged all necessary elements to prevail in their claim that O.O. was discriminated against on the basis of disability, Defendants *Motion* should be denied.

**I.  Defendants Failed to Provide Due Process Protections in Their Exclusion of O.O. from the DD Waiver**

The Due Process Clause of the Fourteenth Amendment guarantees "more than fair process," but covers a "substantive sphere as well, barring certain government actions regardless

of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (internal quotation marks and citations omitted). Plaintiffs allege claims that Defendants' actions violate both provisions.

Due process protects "the individual against arbitrary action of government . . . whether the fault lies in a denial of fundamental procedural fairness . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id.* at 846-47 (internal quotation marks and citations omitted). The Tenth Circuit has explained that a claim for relief for substantive due process must show that Defendants' conduct was "arbitrary, lacking a rational basis, or shocking to the conscience of the Court." *Cohon*, 646 F.3d at 731. "[P]rocedural due process is a guarantee that the state will not deprive individuals of a protected liberty or property interest without the benefit of procedures such as notice and an opportunity to be heard." *Id.* at 732 (internal quotation marks and citation omitted). The "weight of authority holds that applicants . . . have a constitutionally protected interest in government benefits for which they have applied." *Lewis*, 94 F.Supp.2d at 1237.

1.     **The FAS Exclusion Violates Substantive Due Process Protections**

Plaintiffs have alleged that Section 8.290.400.10(B)(3) limits the definition of "related conditions," to ID, to certain specified diagnoses. Doc. 1-2, at ¶ 72. The "related condition" definition, while still narrower than the federal definition, did not restrict broader categories of conditions to a highly restrictive list of diagnoses until October 2012. Under the previous regulation, O.O. would have been allowed to present evidence that she met the criteria for the D.D. Waiver. Doc. 1-2 ¶¶ 87-89. As noted previously, Section 8.29.400.10(B)(3), was taken from the 1992 AAIDD List, and the State deleted from Section 8.29.400.10(B)(3) five and a half

pages of the 1992 AAIDD List, including the reference to FAS as a perinatal and postnatal cause of ID. Doc. 1-2, at ¶ 73-7481. This table is an "etiology or causation table," and AAIDD included a cautionary note in the 1992 manual that explained that the table was not exhaustive, but the note was not included in the regulation. Doc. 1-2 ¶¶ 75-77, 80. As discussed above, AAIDD abandoned the list after concluding that it is impossible to stay current with the changing science and include all causes of ID. Doc. 1-2 ¶¶ 95, 97. In 2012, Disability Rights New Mexico wrote to Defendants, recommended against adoption of the new standards, and warned the regulations would unfairly marginalize people with related conditions resulting from environmental factors. Doc. 1-2 ¶¶ 90-91. Indeed, the original statutory scheme for assisting the developmentally disabled limited the term "developmentally disabled" to include only "conditions attributable to mental retardation, cerebral palsy, epilepsy, or autism." *Ass'n for Retarded Citizens of N.D. v. Sinner*, 115 F.R.D. 28, 30-31 (D.N.D. 1987) (internal quotation marks and citation omitted). Congress soon abandoned the "diagnostic approach" and "adopted the current functional approach, thereby expanding the definition to include all persons with disabilities attributable to mental or physical impairments who also meet the functional criteria." *Pacheco,* 1996 WL 936911 at * 5; *Lynch* 507 F. Supp. at 1275.

Defendants' decisions to exclude five pages of the AAIDD List, to disregard the cautionary note and the well-known professional judgment AAIDD and to disregard the United States Congress are arbitrary and completely lacking in rational basis. *Cohon*, 646 F.3d at 731; *see e.g. Youngberg,* 457 U.S. at 322 (advising that courts should defer to the judgment exercised by qualified professionals to determine the "reasonableness" of minimally adequate training necessary to satisfy the constitution). 8.290.400.10(B)(3) NMAC demonstrates a deliberate

indifference to developmental disabilities that result from environmental factors. Neither the State of New Mexico nor the federal Medicaid standards provide a rational or reasoned basis for distinguishing and excluding environmentally based developmental disabilities. Defendants have arbitrarily and irrationally excluded FAS from "related conditions," and as a result, have violated O.O.'s substantive due process protections.

### 2. The FAS Exclusion Violates Procedural Due Process Protections

O.O. has a protected property interest in her Medicaid benefits. *See Lewis*, 94 F.Supp.2d at 1237. When an individual qualifies for an ICF/IID, the Medicaid act guarantees her the opportunity to choose institutional or home-based care if the state has elected to provide home-based care. Defendants refused to admit O.O. to the DD Waiver waiting list without a meaningful opportunity to be heard regarding the essential eligibility requirements and without notice that FAS was categorically excluded. Doc. 1-2 ¶¶ 70-71. Defendants can provide no evidence that any fact other than O.O.'s FAS diagnosis contributed to her exclusion from the DD Waiver waiting list. Doc. 1-2 ¶¶ 105-107. O.O. did not have a meaningful opportunity to demonstrate her eligibility and did not have notice of the criteria.

Defendants cite *Okla. Educ. Ass'n* and argue, "the legislation and rulemaking process is all the procedural due process to which they are entitled." Doc. 5 at 19. In *Okla. Educ. Ass'n*, members of the public employees association challenged a law that prevented them from working in "any phase of the alcoholic beverage business." 889 F.2d at 931. The employees argued that they were entitled to individual hearings to present evidence that they should be able to obtain individual liquor licenses. *Id.* at 936. The Court denied a procedural due process

challenge, because the Oklahoma legislature adopted a scheme that prohibited such licenses and did not provide for hearings. *Id.*

The regulatory scheme related to the D.D. Waiver permits hearings, and O.O. does not argue that Defendants denied her a hearing. Instead, O.O. did not have a meaningful opportunity to be heard and the she did not have notice of the criteria in the application phase because the application does not set forth the criteria by which an applicant will be measured. Because of the failures of process, an applicant—who, by regulation must also "meet both financial and medical criteria for an institutional . . . or intermediate care facility"—has no meaningful opportunity to establish that she is an individual with an intellectual disability. 8.290.400.9 NMAC

## J. Plaintiffs Are Entitled To Declaratory Relief

Plaintiffs seek all declaratory relief available to them as equitable relief for violations of law alleged in their complaint. Doc 1-1 at 36. In addition, Plaintiffs have specifically alleged a claim under the New Mexico Declaratory Judgment Act ("NM DJA"). NMSA 1978, § 44-6-1 et. seq. (Count 7). The NM DJA permits courts to determine "any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder." Section 44-6-4. Plaintiffs allege that Defendants misconstrued their obligations by excluding persons with FAS from consideration for eligibility for the DD Waiver even though such persons meet the essential criteria of "related conditions" as defined by federal law. The state promulgated rules that deny O.O. fair consideration for DD Waiver services.

The NM DJA permits plaintiffs to challenge the rule-making authority of administrative agencies and to determine whether the agency is acting within its authority. *See Hanosh v. State*

*of New Mexico, ex. rel., Gary King*, 2009-NMSC-047, ¶ 4, 147 N.M. 87. (explaining that state agencies, as executive agencies, are accountable to statutory limitations.); *see also Hanosh v. N.M. Envtl. Bd.*, 2008-NMCA-156, 145 N.M. 269. Plaintiffs seek a determination that Defendants exceeded their authority under federal and state laws in promulgating 8.290.400.10(B) NMAC, because the regulation violates federal and state laws by limiting the recipients who may be considered eligible for the DD Waiver and excluding persons with FAS from qualifying as persons with a "related condition."

In addition, determination of whether O.O. is eligible to register for the DD Waiver cannot be fairly adjudicated without judicial determination of whether 8.290.400.10(B) NMAC violates federal and state laws. *See e.g.* Doc. 1-2 ¶¶ 29, 74-110. Plaintiffs are specifically seeking declaratory judgment against the Defendants requiring them to withdraw, terminate or stop implementation of 8.290.400.10(B) NMAC because it violates a clear, mandatory duty to comply with state and federal law as set forth above.

Similarly, the HRB made a legal determination that it has no jurisdiction to determine whether Defendants have violated O.O.'s rights under the NMHRA. Doc. 1-2 ¶ 33. The basis for its decision was HRB's legal interpretation that the DD Waiver program is not a "public accommodation," which HRB interprets to exclude any public program "based on specific eligibility criteria requiring approval for those individuals with physical or mental disabilities." Doc. 5-2 at 1. Plaintiffs seek a determination that HRB misconstrued the term "public accommodation" under the NMHRA, which defines "public accommodation" as "any establishment that provides or offers its services, facilities, accommodations or goods to the public, but does not include a bona fide private club or other place or establishment which is by

its nature and use distinctly private." NMSA 1978, 28-1-2(H). DD Waiver services are public programs and persons with disabilities are public citizens. As such, Plaintiffs seek judicial determination that they are entitled to seek redress under the NMHRA for Defendants' refusal to consider O.O. for the DD Waiver. Under the NM DJA this Court may clarify O.O.'s rights under the NMHRA.

## IV.   CONCLUSION

Plaintiffs' *Complaint* sufficiently alleges claims for violations of the Medicaid Act, the ADA, the Rehabilitation Act, the Federal and State constitutions, and the NMHRA. Defendants further violated state rule making procedures. Plaintiffs have timely noticed appeals of two agency decisions, which are final orders that are ripe for this Court's review in the event that the Court elects to exercise its supplemental jurisdiction. This Court should deny Defendants' *Motion to Dismiss* and offer any other relief this Court deems just.

Respectfully submitted,

/s/ Matthew Bernstein
Matthew Bernstein
Tara Ford
3201 Fourth St. NW
Albuquerque, NM 87107
(505) 244-1101
(505) 244-0060 (Fax)

*and*

J. Kate Girard
Katherine Wray
Wray & Girard PC
102 Granite Avenue NW
Albuquerque, NM 87102
505-842-8492
Fax: 505-243-2750
Email: jkgirard@wraygirard.com

kwray@wraygirard.com

*Attorneys for Plaintiffs*


It is hereby certified that a true copy of
the foregoing pleading was served via
CMECF to Plaintiff c/o:

MILLER STRATVERT P.A.
Jennifer D. hall
Stephen B. Waller
Holly Agajanian
Attorneys for Defendants
P.O. Box 25687
Albuquerque, New Mexico 87125
(505) 842-1950
(505) 243-4408 (fax)
jhall@mstlaw.com
hagajanian@mstlaw.com
swaller@mstlaw.com

on the 1st day of July, 2016

        /s/ Matthew Bernstein